# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

TRESA BROWN, as personal representative
of the Estate of Jerry Dwight Brown, and on
behalf of herself as survivor and on behalf
of Survivor's Sons 1 and 2,

      Plaintiff,

v.                                 CASE NO.  8:16-cv-3155-T-02SPF

CHRIS NOCCO, in his capacity as
Sheriff of Pasco County, Florida, and
DANIEL LESLIE GREEN,

      Defendants.

_____/

## O R D E R

   Pasco County Sheriff deputies  arrested a small-time drug dealer on July 1, 2014.  While arresting the unarmed suspect the officers shot him three times, twice in the back.  He died.  His estate brings this suit.

   Plaintiff sues defendant Sheriff Deputy Green under 42 U.S.C. § 1983 for violating the civil rights of plaintiff's decedent under the Fourth Amendment to the U.S. Constitution through an excessive force arrest.  Plaintiff alleges that

1

Green fired the final, death-inducing shot into decedent's back unnecessarily. Plaintiff sues Sheriff Nocco in Count II under the Florida tort of wrongful death, alleging that Nocco and employees for whom he is vicariously liable negligently caused the death of plaintiff's decedent.

This matter came before the Court upon the motions for summary judgment filed by Deputy Green and Sheriff Nocco. Dkt. 85. After a review of all materials submitted in the case, including close study of the video from the arrest, the Court took oral argument on the motion from the lawyers. The Court denies the motion for summary judgment as to both defendants. The Court sets the matter for the trial term commencing February 4, 2019.

## I. *STANDARD OF REVIEW*

Under Rule 56, Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). *See Mize v. Jefferson City Bd. of Educ.,* 93 F. 3d 739, 742 (11th Cir. 1996). If that standard is met, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial. *Shaw v. City of Selma*, 884 F. 3d 1093, 1098 (11th Cir. 2018).

To prevent summary judgment, a factual dispute must be both material and

genuine. *Id.* "A fact is 'material' if it has the potential of 'affect[ing] the outcome of the case.'" *Id.* And, to raise a genuine "dispute," the nonmovant must point to enough evidence that "a reasonable jury could return a verdict for [her]." *Id.*

The Eleventh Circuit teaches that "[w]hen considering the record on summary judgment 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" *Id., citing Tolan v. Cotton,* 572 U.S. 650, 134 S. Ct. 1861, 1863 (2014).

## II. *AS TO COUNT I*

### *UNCONTESTED SALIENT FACTS*

Although at this stage the Court is required to review the facts and their inferences in a light most favorable to the non-movant, the recitation of facts in this first section is done with as much even-handedness and equipoise as the Court can muster.

Jerry Brown worked at his father's tire company in Pasco County, Florida where this incident occurred. Mr. Brown also sold opiate pills like Vicodin and Dilaudid as a sideline, often at or near this premises. On three prior occasions in 2014 Brown sold these pills to undercover Sheriff deputies, in quantities ranging from 5 to 73. On July 1, 2014, the deputies planned to make one final pill

purchase from Brown, and then arrest him.

Jerry Brown had a criminal record which included an armed robbery of 17 years ago.  This robbery event also included a kidnaping conviction.  In preparing for the "take down" of Brown, the deputies believed erroneously that Brown had two or three armed robbery priors in addition to the kidnaping charge.  Thus at the time of the planned arrest, deputies possessed knowledge about Brown's record and prior violence that was somewhat overstated.

The Pasco Sheriff's Office previously did low level pill purchases from Brown at the tire company premises in 2011 and 2012.  Brown was on probation in 2014. The deputy who shot at Brown three times was involved in an earlier arrest of Brown without incident or violence at the tire company premises.  Brown had also shown no weapons or violent activity in the earlier 2014 pill buys with these deputies.[1]  This record has no indication that the deputies tried to arrest Brown through the offices of his probation officer.

Prior to the take down, the deputies had practiced the details several times. The plain-clothed undercover officer was to get Brown to enter the undercover vehicle.  Then once Brown displayed the pills for sale, the undercover deputy would give the signal verbally (the event was monitored electronically) and by

_____

[1]  See docket 90, at 88-90, Cabbage depo. 1/24/2018.

4

tapping the brake light.

The arresting officers, wearing visible law enforcement attire, would position themselves as follows: One deputy was to directly face the seated Brown, two feet in front of him outside the windshield, in shooting stance with a gun trained on Brown. This deputy was to yell commands to Brown: "Sheriff's Office, show your hands." Another deputy was to press a ballistic shield, plainly labeled with "Sheriff's Department," against Brown's passenger side window, precluding Brown's escape and coercing compliance. Defendant Deputy Green was to position himself at about 5 o'clock or 130 degrees from the front of the car, and was to remain with his weapon holstered until Brown showed compliance. Once Brown was compliant, the shield bearer was to open the passenger door and defendant Green was to extract Brown, take him to the ground, and handcuff him.[2] A final deputy was to remain at about 3 o'clock or 90 degrees from the front of the car, about 8 feet away, as a gun-drawn backup in shooting stance.

This Court has reviewed the video of the shooting approximately 20 times, at full speed, half speed, 1/10th speed, and frame by frame. Notwithstanding this level of scrutiny, the first time the undersigned viewed the video, it appeared

---

[2] See docket 98-1, at 35-36, Green State Attorney's Office (SAO) statement 7/1/14, at 13, 14.

troubling. The "take down" did not happen as planned, and Brown was dead or dying about 10 seconds after it started.

What the video shows for several minutes is the undercover buying pills from Brown. Both the recorded audio and video are of good quality and the car windows and doors are shut. The undercover is fairly aggressive in getting a reluctant Brown to enter the undercover vehicle and to display the pills. Brown has only nicotine and caffeine in his body, per the autopsy. Brown is in the passenger seat with the undercover deputy behind the wheel of the parked undercover vehicle, a small Nissan Rogue SUV. The video recorder is on the undercover deputy's body. Brown can be seen taking two small plastic bags of pills from the right pocket of his cargo shorts.[3] The undercover demands that Brown display the pills clearly. After Brown shows the pills, the undercover gives the bust sign and slowly counts out the money. The approaching take-down van full of deputies can be seen in the rear view mirror, but Brown does not see it. The relevant time sequence on the video is as follows, with the last two digits being seconds. The arrest itself begins with Brown and the undercover in the front seats of the car, as follows:

**30:36** No activity can be seen as the undercover is facing the dash, but we hear

---

[3] See video at 29:50-54; 30:18.

6

one thump.

**30:37**  In this second, the undercover turns to the right, Brown's hand begins moving toward the passenger door and reaches the inside door handle, the ballistic shield goes up against the passenger door outside, and we hear a second thump. [The deputy who was in front of the windshield testified he made this noise to get Brown's attention.[4]  The attitude and glare of the sun into the video camera precludes us seeing this deputy].  We hear multiple, loud indecipherable shouting starting now, from outside the car; most likely three deputies yelling at once. In this second and into **30:38** Brown's hand is still on the inside door handle, and he pivots his left hand or shoulder, as if to open the door.  The shield bearer outside the car pushes the passenger door back shut quickly when Brown opens it slightly. One hears the same indecipherable yelling.

**30:39**  In this second Brown's left arm comes down and he appears to lean and reach into his right pocket with his right hand - or at least go to his right pocket with his right hand. [The pills are not clear from the video but after the shooting the pills were found in the right pocket of his cargo shorts].  There is more indecipherable yelling.

**30:40** In this second the deputy standing about 18 inches in front of Brown fires

---

[4]  See docket 90-2, at 13; docket 98-1, at 8-10, Cabbage SAO statement 7/1/14, at 7-9.

through the windshield, and the glass inside the SUV explodes with a shot. Brown is shot through the upper abdomen, a severe, possibly fatal, injury. At the very time the shot happened, one can for the first time make out a decipherable command to the effect of "hands up."

**30:41**  In this second the undercover deputy rapidly exits the driver's side of the SUV and retreats, carrying on his person the video recorder.

**30:41, 42**  The deputy at the front windshield remains in his standing tactical position and fires two more shots at Brown, one at second **:41** and one at second mark **:42.**  One of these bullets misses. The other hits Brown's right buttocks. The bullet travels in an upward direction in Brown's buttocks from right to left, lodging in the right buttock.  The windshield deputy shoots no more. This deputy has shot at a downward angle into Brown, with the bullet path measured at 70 degrees downward from horizontal.

**30:46**  In this second defendant Green has moved forward to about a 2 o'clock position from the front of the car, about 24 inches from the open passenger door. Green testified he moved forward to avoid a cross fire once the shooting started. In the interim, the shield bearer has opened the passenger side door of the car for

extraction.[5]  Green is now unholstered in a standing tactical stance.  The cover

deputy is in a tactical stance about 12 feet away with gun drawn.  Green has gun

drawn with shot line at a downward angle.  He begins to yell "show your f-----g

hands" which is audible and discernable.

**30:47**   Immediately after yelling the command, Green fires once into the car at a

downward angle.  Green shoots without pausing after saying the word "hands."

Green's shot enters Brown's back, about 2 inches left of center and 21 ½ inches

below the top of Brown's head.  The bullet travels upward in Brown's body,

lacerating Brown's  spinal cord,  piercing the lower lobe of Brown's right lung,

and lodging in the right pectoral muscle.   Deputy Green's shot was at least a

material contributing cause of Brown's death, which occurred a short time later.

This is the shot contested in Count I.


### *THE COURT'S IMPRESSION OF THE FACTS*

#### *A.  Deputy Green's Testimony Is Not to be Credited*

Deputy Green is not an accurate historian concerning the shooting, most likely

due to the stress and instant nature of it.  His misstatement of facts due to this

---

[5]  See video frames 120-125; docket 92-2, at 22, Green Sheriff's Office (SO) statement
7/1/14, at 22; docket 94, at 87, 92, 100-101, Caruso depo. 1/24/18, at 87, 92, 100-101.

stress and rapid time frame is quite understandable, and the Court does not find him to be dishonest. But these mistakes are plain, and preclude crediting his testimony. Although the qualified immunity inquiry is objective rather than subjective, Deputy Green's factual recitation must be discounted entirely in considering objective facts of what happened here.

Deputy Green perceived that Brown was yelling before the first gunshot went off. This is inaccurate. Deputy Green stated that he gave a verbal command but Brown wasn't complying. The tape shows Green's shot came without time for Brown to comply with Green's command. The Eleventh Circuit has noted the real credence that should be given to contemporaneous tapes in these circumstances. *Shaw, supra,* 884 F.3d at 1098.

Deputy Green testified to the State Attorney on the day of the shooting that he shot Brown in the chest.[6] Green actually shot Brown in the center of his back.

In his videotaped deposition, Green stated and showed physically that when he shot Brown, Green could see Brown's face from a side profile, suggesting Brown was arched about 45 degrees to the left with Brown's left shoulder raised, towards the center of the car. Green testified that he was not behind Brown, and given the

---

[6] See docket 92-2, at 21-22, Green SO statement 7/1/2014, at 20-21; docket 98-1, at 39-42, Green SAO statement 7/1/14, at 17-20; and docket 92, at 9-10, Green depo. 1/24/18, at 9-10.

positioning Green assumed Brown could have and did see and hear Green give commands. But the location and path of Brown's bullet wound from Green contradicts this.

Also problematic is Green's testimony that, from his relocated position, he could see blood on Brown's chest. The first shot hit Brown in the abdomen, but the second strike from the windshield hit Brown in the buttocks and went upward, suggesting Brown was turned around prone (also consistent with Green's bullet in Brown's back, path upward). The blood stain on the cloth console between the seats suggests Brown's abdominal wound bled there while Brown lay on his stomach.

Green also erroneously testified that when Brown opened the passenger door Green could see Brown's hand in Brown's pocket. The video shows this was impossible. Brown only opened the door very slightly, and then the shield bearer immediately shut it, while Green was still at 5 o'clock to the car. Green also mistakenly testified that the open door through which Green shot was made open by Brown. Green believed Brown had "two or three" prior armed robberies,[7] but Brown had one, 17 years earlier.

---

[7]  See docket 98-1, at 41, Green SAO statement 7/1/14, at 19; and docket 92-2, at 5, Green SO statement 7/1/14, at 4 (robberies).

None of Green's testimony on these points was accurate, especially when one considers the trajectory of Green's bullet. Green was firing from a position higher than Brown's body through the opening created by the open passenger door. Since Green's bullet hit several inches to the left of Brown's spine (21 ½ inches from the top of Brown's head) and traveled upward, from left to right, Brown had to be fully turned away from Green at the time of the shot and at least in a prone or horizontal position, or more likely with Brown's shoulders below his hips, to permit the bullet to travel upward in Brown's body. This is what the clear facts appear to be to the undersigned judge, and certainly these facts are strong if considered in a light most favorable to the non-movant.

During the State Attorney's inquest after the shooting, Deputy Green testified that during this short period Brown's pocket puffed out or bulged to where Green thought Brown might have a gun in it. This is unworthy of credit given the facts presented and the location of the participants. The video shows to the contrary.[8]

The testimony of the deputy at the windshield who fired the first three shots, hitting Brown twice, is not helpful to defendants and contradicts Green on a

_____

[8] See docket 98-1, at 43-44, Green SAO statement 7/1/14, at 21-22; and video, at **16:28:43 - 52; 16:29:05,16,29,47**.

In the "take down" van that carried the deputies to and from the arrest, there was found after the incident a small pistol that was not issued by the Sheriff's Office, ownership unknown.

12

material point.  That deputy stated that after he fired the third shot at Brown, "I believed the threat was stopped."  This deputy stated that he believed he had stopped the threat with the rounds he had fired: "So my assumption was I had stopped the threat with the rounds I fired."[9]  This deputy fired three times in a row, followed by Green about 5 seconds after shot number three.  The plaintiff notes that this testimony suggests Green's shot was unnecessary.

Another issue arises as to Green's reaction: The plan was for the shield bearer to open the passenger door when Brown was compliant and could be removed and handcuffed.  After the three shots through the windshield, the shield bearer did open the passenger door.  He testified he did so for extraction, and intended to do that once it appeared safe.  Plaintiff suggests this shows the shield bearer believed Brown was compliant.  There is some merit in this suggestion.  The shield bearer testified that he opened the door for defendant Green, if Green felt extraction was appropriate, "to give the option if – if Detective Green was comfortable, at that point, to start the extraction."[10]

---

[9]  See docket 90, at 78, 83-84, Cabbage depo. 1/24/18, at 78, 83-84.

[10]  See docket 94, at Caruso depo. 1/24/18, at 87, 92; docket 98-3, at 18, Caruso SAO statement 7/1/14, at 18; and docket 94-5, at 9, 11, Caruso SO statement 7/1/14, at 9, 11 ("option").

### B. There Were No Clear Commands

Throughout this case and during the inquest made by the Sixth Judicial Circuit Assistant State Attorney, the deputies have maintained that consistent, clear commands were given to Brown, who defied them. This is not accurate. The commands were almost entirely indecipherable. Green's command before Green shot was audible, but left no time for compliance.

The taped audio in this record is of good quality. No clear commands can be heard, only noise. Not until the gun first fired through the windshield could a somewhat clear command first be heard.

Although one may surmise that Mr. Brown, a prior multiple arrestee, knew quite well that the police were there to arrest him, there is no direct proof of that in this record other than Brown's attempt to get out of the car when the arrest started. That a startled and panic-stricken Brown was trying to flee what he knew to be a police arrest is a likely inference. Another possible inference is that he saw a gun two feet from his face and feared a robbery while in a car he had preferred not to enter. Crediting the inference that Brown was aware of the deputies' lawful purpose and understood their commands cannot honestly be done if the facts and inferences are viewed in a light most favorable to the non-movant. If we had a clear, audible command given with time to comply, this point would be quite

different.

The shield-bearing deputy testified the deputies did not actually expect immediate compliance. He said, "After the shock [of the shield distraction] we don't expect the hands to come up within a split second because that's the whole point is to shock them in the beginning and just to completely distract them." Just as decedent Brown did, this deputy testified " a lot of time[s] – at first it's shock, and then someone becomes either immediately compliant or they try and hide the drug."[11]

The officers testified that they were sure Brown understood their commands. But this is surmise, and most of this testimony is based upon the deputies' insistence that their commands were clear, could be heard and, if heard, could be complied with prior to shooting. Clear commands could not be heard on the audio where Brown was sitting, and no clear audible command was issued with time for compliance prior to shots fired.

Concerning the commands, the "cover officer" about eight feet away testified, "Everyone began yelling . . . . There was a lot of yelling going on." This officer also testified that he heard the officer at the windshield yell commands "at least 15

---

[11] See docket 94-5, at 13, Caruso SO statement 7/1/14, at 13; and docket 98-3, at 10, Caruso SAO statement 7/1/14, at 10.

times maybe." That statement is contradicted by the tape. The cover deputy also testified, "well it sounded like everybody was yelling," and "they were so loud I could not hear [Brown] say anything."[12]

The shield bearer testified he and the windshield deputy were yelling nonstop loud verbal commands.[13] Deputy Green suggested that three people were yelling verbal commands, which would explain the indecipherable cacophony one hears on the video.

### C. Bullet Wounds #2 and #3 Are Problematic

The first shot happened three seconds after the arrest began when Brown appeared to go for his right pocket. The deputy directly in front of Brown shot Brown in the front midriff through the windshield. The deputy then fired twice more in fairly rapid but deliberate cadence, 70 degrees downward from horizontal. The record is disputed which of the next two shots (number two or number three) hit Brown. Fired from above Brown's body the second strike hit Brown in the right buttocks, going upward in his right buttocks tissue. This suggests Brown

---

[12] See docket 93-1, at 13-14, Gutierrez SAO statement 7/1/14, at 8 ("15 times"), 9 ("everyone yelling"), and 11-12 ("so loud"); and docket 93-2, at 9, Gutierrez SO statement 7/1/14, at 8 ("everyone yelling").

[13] See docket 98-3, at 9, Caruso SAO statement 7/1/14, at 9; and docket 98-1, at 37, Green SAO statement 7/1/14, at 15.

was on his stomach with his back to the shooter, with Brown flat, or with hips higher than his shoulders. Certainly this suggestion is true if one views the evidence most favorably to the non-movant.

Such a position of Brown is consistent with the general impression of his movements after being shot in the abdomen, given the tape and facts present. And there is a large bloodstain on the cloth floor console between the front seats, upon which it appears Brown, shot through the abdomen, likely lay and bled.

Once shot, Brown appears to have been trying to avoid the direction of the gunfire, caterwauling, wailing audibly, and crawling backwards in the car between the seats. Thus the facts suggest Brown presented his bottom to the shooter who was standing in front of the windshield, on the passenger side. Such a location of Brown and bodily position tends to impeach the deputies who urge that even after the first shot, Brown was a threat, ignoring clear commands and noncompliantly reaching for his pocket, perhaps repeatedly. The facts seem to be that Brown was wallowing, head towards the rear of the car, face down, and buttocks above or at least level with shoulders. This is inconsistent with Brown needing more bullets than the first to be brought under control, but more importantly is inconsistent with what the deputies stated happened.

As to the Green shot which occurred about 7 seconds after the first, these

points are all the more so when considered in a light most favorable to the non-movant.  The facts do not support that at the time Green pulled the trigger Brown was even partly or sideways facing Green, or Brown had his hand in his pocket, and was presenting as a threat, noncompliant to Green's clear command.

## *LEGAL ANALYSIS AS TO COUNT I*

Several preliminary legal issues are clear as to Count I.   First, the decision to effect an arrest of Brown for prior pill sales and the instant pill sale was within the scope of Deputy Green's discretionary authority, as that term is used in the qualified immunity context.  Likewise, once the ballistic shield blocked Brown in the car, and his egress was prevented by the shield bearer and fellow officers who came to arrest, Brown was clearly "seized" or under Fourth Amendment arrest. And Brown possessed a Fourth Amendment right to be free from the use of excessive force in the course of the arrest.

The burden lies with plaintiff to show that qualified immunity is not appropriate for an officer within his discretionary authority.  *Saunders v. Duke,* 766 F.3d 1262, 1266 (11th Cir. 2014).  The test is one of objective reasonableness. "[T]he 'reasonableness' of a particular force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight."

18

*Id.*

The Eleventh Circuit teaches that this test requires inquiry into the specific factual details. Factors to consider include the severity of the crime at issue, whether the suspect posed an immediate threat to safety, and whether he was actively resisting or attempting flight. In other words, the Court must consider "the need for the application of force, the relationship between the need and the amount of force used, [and] the extent of the injury inflicted. *Id.* And in considering these factors at this stage, "we cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party." *Stephens v. DeGiovanni*, 852 F. 3d 1298, 1315 (11th Cir. 2017).

Apt Supreme Court teaching on this issue is *Tolan v. Cotton,* 572 U.S. 650, 134 S. Ct. 1861 (2014). The two-part test is 1) did the officer's conduct violate a federal right, and 2) was this right clearly established at the time of violation? *Id.*, 134 S. Ct. at 1865 - 1866.

With these legal guideposts in mind, the facts show the following: Brown was a small-time pill dealer, with no violent tendencies shown in any recent period and not in his recent drug sales with Pasco undercover deputies. The sales were "low-end" albeit serious illegal sales of prescription pills of the opiate variety. One of

the officers had arrested Brown in the past without incident.  No officer involved
had seen Brown armed before, Brown was unarmed here, and he made no threats
of violence.

The facts show that the "take down"  was designed so the windshield officer
and the undercover officer were in open and clear proximity to Brown at the time
of arrest.  Thus if Brown did not comply *immediately*, and if he put his hands in or
to his pockets (which appears he did to stash the pills, and certainly so viewing the
facts most favorably to plaintiff) Brown was going to get shot almost
instantaneously.

And indeed, that is what occurred.  As intended by law enforcement, Brown
appears to have been shocked upon the thumping, the ballistic shield, and the
windshield officer present, with the loud multiple yelling.   First, Brown pushed
against the car door to attempt exit, then appears to have put the pills in his pocket,
whereupon he was shot the next second in the gut at very close range.   Brown
then rolled over caterwauling, and was shot again in the buttocks.  Seven seconds
after the gut shot, Brown on his stomach, bleeding profusely onto the console
between the seats,  head pointed towards the back of the car, was shot in the back
by Deputy Green.

Viewing these facts in a light most favorable to the non-movant, Brown was

severely wounded with two bullets in him at the time Deputy Green fired the shot at issue in Count I.  Viewing this evidence in this manner, no reasonable officer would find Brown a threat at the time Green shot.  The conduct and testimony of both the windshield officer, and the shield bearer who opened the door for extraction,  supports that Brown was not a threat to safety when Green shot him.  It also is clear, viewing the facts in this manner, that Brown did not receive a clear, audible warning to which he had time to comply.  Thus the first test, that Green shooting Brown in the back violated a federal right to not be subjected to unnecessary force upon arrest, appears to have been met in plaintiff's favor

   As to the second prong, an arrestee's right to be free from being shot in the back when he does not constitute a threat to safety or flight is clearly established under the Fourth Amendment.  *Saunders*, 766 F. 3d at 1267.  *Accord Tolan, supra,* 134 S. Ct. at 1866 (non-fatal shooting: "Our qualified immunity cases illustrate the importance of drawing inferences in favor of the nonmovant . . . inquiring as to whether conduct violated clearly established law 'in light of the specific context of the case' and construing 'facts...in a light most favorable to' the nonmovant").   It is a contested issue of fact  for the jury to decide whether Green violated this clearly-established right of Brown's.  At this stage, these facts do not entitle Green to summary judgment based upon qualified immunity from suit.

Viewed in a light most favorable to plaintiff, the facts evince an objectively unreasonable decision, without probable cause, for Deputy Green to fire into the car at Brown's back.

It is axiomatic that courts should not view officer's actions with 20/20 hindsight, and police officers are not required to wait until the suspect draws a gun or takes action before engaging defensive measures, even deadly ones. And officers may apply whatever force is needed, for however long needed, to end a reasonably perceived threat and achieve compliance. *E.g., Shaw, supra,* 884 F. 3d at 1100, citing cases. This abiding wisdom might be more aptly applied (and yield a different result) if the Court were judging the three shots fired by the windshield deputy.

But here we are reviewing Green's shot on the totality of the circumstances. *Garrett v. Athens-Clarke County,* 378 F. 3d 1274, 1280 (11th Cir. 2004). Green shot without a real warning 7 seconds after the first shot, when the unarmed suspect was head backwards in the car, on his stomach bleeding with two near-mortal wounds. And two of Green's fellow deputies had taken actions that suggested they viewed the threat abated. The objective reasonableness of Green's shot, whether the firing by Green into Brown's back was "reasonably proportionate for the need for that force," is for the jury. *Cf. Lee v. Ferraro,* 284

F. 3d 1188, 1198 (11ᵗʰ Cir. 2002), cited in *Shaw, supra,* at 1099.

In some cases, the officer is mistaken about probable cause to use deadly force, but still protected by qualified immunity.   In these matters, "arguable probable cause" exists, or the officer was reasonably mistaken about probable cause. *E.g.,* *Vaughan v. Cox*, 343 F.3d 1323, 1332 (11ᵗʰ Cir. 2003).  This is not such a case.  A reasonable jury could well find that  Deputy Green faced an unthreatening man lying prone, bleeding out on his stomach, and Deputy Green issued a command that could not be complied with before firing.   Further, it is difficult to establish "arguable probable cause" when the source of those facts cannot be credited,  nor relied upon to provide a proper history.  *E.g., Kingsland v. City of Miami,* 382 F. 3d 1220, 1232 (11ᵗʰ Cir. 2004).  The facts as the Court must view them show no "arguable probable cause" can exist to immunize Deputy Green from this lawsuit.


### III.  *AS TO COUNT II*

Movant Sheriff Nocco moves for summary judgment as to Count II on several grounds.   First, movant contends that the force used was constitutionally reasonable and does not constitute battery.  As to this ground, the Court has already found a disputed issue of material fact whether the shooting of Jerry Brown (at least by movant's agent Green) was constitutionally reasonable.  The

Court has found that qualified immunity does not protect movant's agent Green from suit.

Count II sounds in negligence, and does not allege the tort of battery. Nor could it, as negligent infliction of excessive force is not a cause of action recognized by Florida because, basically, battery is not a negligence-based cause of action. *E.g., City of Miami v. Sanders,* 672 So.2d 46, 47 (Fla. 3d DCA 1993). Among the allegations in Count II are the negligent use of firearms to shoot Brown. "Florida law...clearly recognizes a cause of action for the negligent handling of a firearm and negligent decision to use a firearm separate and distinct from an excessive force claim." *Lewis v. City of St. Petersburg,* 260 F. 3d 1200, 1263 (11th Cir. 2001).

The movant's next grounds in support of summary judgment on Count II is that there is no duty of care. The Sheriff argues that Florida negligence law creates no duty of care owed by law enforcement to a drug dealer in the midst of a drug deal. This contention appears to be precluded by *Kaisner v. Kolb,* 543 So.2d 732 (Fla. 1989) insofar as duty to an arrestee goes, and by *Lewis v. City of St. Petersburg,* 260 F. 3d 1260 (11th Cir. 2001) insofar as any person placed into a foreseeable zone of risk by another, whether that other is a public or private defendant. The Florida Supreme Court in *Kaisner* stated flatly, "So long as petitioner was placed

in some sort of 'custody' or detention, he is owed a common law duty of care."
*Id.* at 734.  The decedent Brown was in custody or detention once surrounded by the armed, drawn deputies in the "take down."  As to duty of care, we need go no further that *Kaisner.*

Movant was the superior, ultimate supervisor of his agents.  At all times in planning and executing the take down the movant's employees were operating within and pursuant to the scope of the authority granted by to them by him. Movant owed a common law duty of care to Brown.  *Kaisner, supra; Lewis, supra; see also Rodriguez v. Miami-Dade Cnty.,* 117 So.3d 400, 408 (Fla. 2013)(police shooting case - reversing summary judgment for County and remanding for trial including allegations of police negligence. "[T]he focus is on whether the police officers were negligent under all the circumstances." ); *Santana v. Miami-Dade Cnty.*, 2015 WL 5084136 (S.D. Fla. 2015).

Whether the Sheriff through his agents breached a common law duty of care to Brown is a disputed issue of material fact.  Besides the issues discussed above related to the shooting, the plaintiff had adequately placed facts into this record – including expert testimony – that, although hotly disputed, should permit the case to go to the trier of fact.

Movant's next point concerning Count II is that the Court should grant

summary judgment because the acts of the deputies are protected by sovereign

immunity.  The Eleventh Circuit has held that:

> The State of Florida and its subsidiaries – including
> municipalities – are generally immune from tort liability,
> see Fla. Const., Art. X § 13, however, Florida has
> waived this immunity "under circumstances in which the
> state or agency or subdivision, if a private person, would
> be liable to claimant, in accordance with the general laws
> of this state."  Fla. Stat. § 768.28(1).  At the same time,
> even if the claim contained sufficient allegations of tort
> liability under which a private person would be liable, the
> waiver of sovereign immunity would still not apply if the
> challenged acts of the state agent were "discretionary"
> governmental acts rather than merely "operational" ones.

*Lewis, supra*, 260 F. 3d at 1262.

Movant therefore contends that Count II brings suit on discretionary acts of the

Sheriff, which are immune.  Plaintiff states the acts sued upon were "operational"

in nature, not discretionary.   This issue was squarely controlled by *Lewis, supra* at

1264 - 65.  *Lewis* states that once the discretionary decision to arrest is made,

which here happened well before the deputies approached Brown at the drug buy,

the actually carrying out of the arrest itself is operational.  "Under Florida law,

when an officer has made an initial discretionary decision to conduct a stop and

then proceeds to carry out that decision, the officer is no longer exercising a

'discretionary' function, but is engaged in an 'operational' task."  *Id.* at 1265.

Plaintiff does not complain about the Sheriff's choice of discretionary standards in the Sheriff's Office force policy manual. Rather, plaintiff complains that such standards were not followed by the operating deputies in the arrest. Plaintiff does not fault the discretionary decision to find probable cause to arrest Brown, nor the Sheriff's applicable policies. Plaintiff contends the arrest operation itself was botched through negligence, resulting in Brown's death. A jury must resolve this issue.

## IV. *AS TO PUNITIVE DAMAGES*

Defendants move for summary judgment on the punitive damages allegations in both Counts. Those motions are denied without prejudice. It may well be that the standards and facts supporting punitive damages are not met, as defendants argue. The Court prefers to hear the facts developed at trial before considering this issue.

**ACCORDINGLY**, the Motion for Summary Judgment (Dkt. 85) is denied.

**DONE AND ORDERED** at Tampa, Florida, on October 12, 2018.

s/*William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

<u>COPIES FURNISHED TO</u>:
Counsel of Record

27